**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4751-15T2

PHILIP MARCHESANI,

    Plaintiff-Appellant,

v.

J.B. HUNT TRANSPORTATION, INC.
and LAURIE PATTERSON,

    Defendants-Respondents.

_____

          Submitted September 12, 2017 — Decided October 31, 2017

          Before Judges Fasciale, Sumners and Moynihan.

          On appeal from the Superior Court of New
          Jersey, Law Division, Burlington County,
          Docket No. L-0330-14.

          Costello & Mains, PC, attorneys for appellant
          (Deborah L. Mains, on the brief).

          Weber, Gallagher, Simpson, Stapleton, Fires &
          Newby, LLP, attorneys for respondents (Julie
          H. Kinkopf and Joseph Goldberg, on the brief).

PER CURIAM

Plaintiff, Philip Marchesani,[1] appeals from the grant of summary judgment in favor of J.B. Hunt Transportation, Inc. (Hunt), and Laurie Patterson (collectively defendants), and concomitant dismissal with prejudice of his complaint alleging defendants contravened the New Jersey Law Against Discrimination (NJLAD).[2] Utilizing the de novo review applicable standard, we reverse.

Looking at the facts in the light most favorable to the non-moving party, the record demonstrates Marchesani applied to Hunt for a job as a truck driver and received a conditional offer of employment on October 14, 2013; the pertinent condition required him to obtain a medical certification proving that he was physically qualified in accordance with United States Department of Transportation (DOT) regulations (the regulations).[3]

Hunt would accept a DOT certification only from U.S. Healthworks. To that end, Marchesani saw Healthworks' Dr. Shanti Reddy on October 15, 2013, for a physical examination. The doctor "temporarily disqualified" Marchesani because she needed further information about his prescription medications - Lyrica, Dilaudid

---

[1] Although plaintiff's surname is spelled "Marchasani" in the Notice of Appeal, it was spelled "Marchesani" in the record of proceedings before the motion court and the parties' other submissions on appeal; we utilize the latter spelling.

[2] N.J.S.A. 10:5-1 to -42.

[3] See 49 C.F.R. § 391.41 (1970).

and Percocet - and clearance from his doctor that he was able to perform duties associated with the truck driver position because he suffered from cervical radiculopathy; a pinched cervical nerve caused pain in his right arm. Until the doctor received the requisite information, she testified in her deposition, the certification would be put "on hold."

Dr. Reddy never issued a certification for Marchesani because she did not receive the information she requested. Hunt rescinded the conditional offer on November 11, 2013. In answers to interrogatories, defendants admitted Marchesani's offer "was rejected because he failed to provide the requested medical documentation necessary to complete and pass the required DOT physical, making him not qualified for employment" under federal regulations.

On February 14, 2014, Marchesani filed a complaint alleging discrimination under the NJLAD. The trial court granted summary judgment finding Marchesani did not establish a prima facie case that he was qualified for the position because he did not comply with the regulations by obtaining a medical certification. The trial court also found the evidence showed the doctor to whom Marchesani was sent by Hunt to obtain the certification informed him about the information she needed to issue the certification.

On appeal, Marchesani contends that he was qualified for the position despite the lack of medical certification. He also contends that a dispute exists as to whether anyone told him what he needed to provide to be certified. Defendants, in opposition, contend that Marchesani's failure to obtain a certification precludes him from establishing a prima facie case that he was qualified for the position. Alternatively, defendants assert, as non-discriminatory reasons for withdrawing Marchesani's employment offer, that he did not provide information necessary to issue his certification, and that he made statements on a 2011 Social Security Disability application that show he was not qualified.

We reverse the order granting summary judgment because there is sufficient evidence, viewed in the light most favorable to Marchesani, from which a reasonable factfinder could discredit defendants' reasons for rescinding Marchesani's conditional offer of employment, and infer that defendants' action was motivated by discriminatory reasons.

We recognize summary judgment should be granted if the court determines "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). We consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the

applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). We review the trial court's decision in these matters de novo, and afford the trial court ruling no special deference. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016).

Some basic principles inform our review. "All employment discrimination claims require the plaintiff to bear the burden of proving the elements of a prima facie case." Victor v. State, 203 N.J. 383, 408 (2010). Our Supreme Court adopted the elements required to establish a prima facie case of unlawful discrimination announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 82-83 (1978); Goodman v. London Metals Exch., Inc., 86 N.J. 19, 31 (1981). A plaintiff meets this initial burden in an NJLAD case by establishing:

> by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications.

> [Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492 (1982).]

Defendants claim, and the motion judge found, Marchesani did not prove he was qualified for the position because he did not provide the required DOT certification. Marchesani did, however, offer competent evidence — a report from John Kirby, M.D., and a Worknet Medical Examination Report — that he was qualified for the job.

Dr. Kirby conducted a physical examination and reviewed Marchesani's medical history and opined:

> Mr. Marchesani has no cardiac, pulmonary, renal, neurological, musculoskeletal, endocrine, gastroenterological, dermatological, or urological problems - - - by history or physical examination - - - that would preclude gainful employment as a truck driver under *§391.41: Physical qualifications for drivers*.

In the November 11, 2013 Worknet report, Paul DeJoseph, D.O., concluded after examination that Marchesani met the standards set forth in the regulations for a one-year period.

Only a modest showing is necessary to establish a prima facie case. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005). The proffered evidence, considered in the light most favorable to Marchesani, sufficiently established a dispute whether he was qualified under the regulations as of November 11, 2013, the date

Hunt told him he was not going to be hired.[4]  Contrary to the motion judge's ruling, Marchesani did not have to have a DOT certification at the time Hunt made the adverse determination.  He need only establish he could have obtained one on that date.

We find no merit in defendants' additional arguments that Dr. Reddy did not receive the Worknet evaluation; Hunt only accepted certifications from U.S. Healthworks; Dr. Kirby did not address Marchesani's use of Lyrica, Dilaudid or Percocet[5] or his cervical radiculopathy.  R. 2:11-3(e)(1)(E).  While such arguments may ultimately prevail before a jury, defendants are not entitled to summary judgment as a matter of law.

When a plaintiff makes out a prima facie case of discrimination we apply the burden-shifting methodology articulated in McDonnell Douglas.  Zive, supra, 182 N.J. at 447-50; Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 595-96 (1988).

---

[4] The motion judge found, "Dr. Reddy herself acknowledged that she never concluded Mr. Marchesani to be physically incapable of performing the job," and that the doctor's testimony "would seem to indicate that [he] may have been physically qualified for the position . . . in terms of true physical capabilities," although she did not find the doctor's testimony proved he was "physically capable of the job."

[5] Dr. Kirby's report indicates he knew Marchesani took Lyrica for diabetic neuropathy, and knew he contended that he discontinued the use of Dilaudid and Percocet at the time he applied to Hunt.

The burden shifts to the employer to state a legitimate reason for denying employment. Zive, supra, 182 N.J. at 449.

The Court, in Zive, cited with approval the procedure utilized in the Third Circuit that:

> if the employer proffers a non-discriminatory reason, plaintiff does not qualify for a jury trial unless he or she can "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."
>
> [Id. at 455-56 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)); see also Bergen Commer. Bank v. Sisler, 157 N.J. 188, 211 (1999) (citation and internal quotation marks omitted) (noting "[a]n employee may meet this burden either by persuading the court directly that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").]

Defendants proffer two non-discriminatory reasons why they did not hire Marchesani: they could not employ him without a DOT certification from Dr. Reddy as required by the regulations, which he failed to obtain; and the statements he made in connection with a Social Security disability application showed he was not qualified for the position.

The burden, therefore, shifts to Marchesani "to prove by a preponderance of the evidence that the reason[s] articulated by

the employer [were] merely a pretext for discrimination and not the true reason[s] for the employment decision." Zive, supra, 182 N.J. at 449 (citing Clowes, supra, 109 N.J. at 596). To avoid summary judgment, "plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons, . . ., was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 431 (App. Div. 1995) (alteration in original) (quoting Fuentes, supra, 32 F.3d at 764).

An examination of the evidence leads us to conclude that Marchesani has provided sufficient evidence to avoid summary judgment. First, there is evidence that creates a dispute whether Dr. Reddy directly advised Marchesani about the information she needed or if she communicated indirectly via defendant Laurie Patterson, an administrative assistant employed by Hunt, thus supporting an inference that Patterson, who communicated with Marchesani exclusively about the position, withheld information that was critical to obtaining the requisite certification.

Dr. Reddy testified she required information detailing Marchesani's prescriptions for Dilaudid and Percocet. Dr. Reddy deposed that she asked Patterson to get information "about Dilaudid

9

and the M.D. who prescribes any of these medications, Dilaudid, Percocet or Oxycontin or any other narcotics that he's taking." Dr. Reddy testified she believed she received forms from Patterson that referenced Marchesani's prescriptions for, among other drugs, Oxycontin and Percocet, but not Dilaudid. She said she never learned the name of the physician who prescribed the Dilaudid — information the doctor admitted she needed in order to "pass him."

When asked if there was "anything else" besides receipt of the bottle for Dilaudid that prevented her from "passing . . . Marchesani in his DOT exam," Dr. Reddy said she did not believe she received clearance from Marchesani's doctor regarding his cervical radiculopathy. Further, although she acknowledged receipt of a note from a medical professional she variously described as a registered nurse or nurse practitioner regarding his prescription for Lyrica, Dr. Reddy said she needed a note from a doctor — not a nurse practitioner or registered nurse — explaining why Lyrica was prescribed for Marchesani. She "needed to make sure that he didn't have any . . . issues with that because he would be driving, and his lower extremities would be of concern for diabetic neuropathy . . . ." She also needed to confirm that Lyrica was not prescribed because Marchesani suffered a brain injury or had "any history of partial seizures or epilepsy." At

the conclusion of her deposition, she said she never received clearance from a doctor.

If Dr. Reddy received the information about the Dilaudid and cervical radiculopathy, she said she would "assess it and go from there."[6] She would have cleared Marchesani if a doctor authorized him to perform the work required of a truck driver.

Marchesani contends Dr. Reddy never told him what information he needed to provide in order to obtain medical clearance; he avers any communication regarding that issue was made through Patterson and that he complied with all of her requests.

The record buttresses his position, manifesting a disputed fact that precludes judgment as a matter of law. When Dr. Reddy was asked if she communicated to Marchesani about the information she needed, most of her answers were equivocal. She couched some of her deposition answers in dubitable terms, saying, "I might have discussed" the information with him.

On one occasion she did not recall if she spoke directly to Marchesani "about the issue with the Dilaudid." On another she remembered asking him for "copies of his medications" because he disclosed he took Dilaudid and Percocet, and explained:

---

[6] The doctor did not say, at that point, she still needed information about Marchesani's use of Lyrica or his diabetic neuropathy.

> So based on my usual practice, when somebody reveals something like that to me . . . I usually tell them if you have that information, come back and let us know, or if you have details on that medication, come back and let us know, and I will instruct the medical assistant in the front to get whatever information that they come back with and to write them down.

She did not recall if she spoke only with Patterson, or with Marchesani, after she received notes and documents that she requested

> because sometimes we do talk to patients, sometimes they give us calls and we talk to them, or sometimes we call them if we think the personnel is unable to convey that properly to the patient, . . . but I don't recall in this particular instance if I did talk to him, or J.B. Hunt personnel did. Either way, I can't be 100 percent.

When shown a form setting forth the information she required, Dr. Reddy said it was "usually hand[ed] over to the patient" but did not know if she or a medical assistant handed it to Marchesani, saying, "[O]ne of us would have." She talked of her usual practices in concluding that someone in her office provided the form to Marchesani.

She spoke of her usual practices again when asked if the needed information was conveyed by the doctor directly to Marchesani or through Patterson and other Hunt employees:

> The day of the exam I would have definitely told him that because that's how I usually

12

practice. I clearly tell them what they need. Sometimes patients do forget, however, I always make sure that they understand, and the paper is given to them, and we offer to fax it from J.B. Hunt facility right away if they have the fax number of the medical doctor that they recall, or if they don't recall, we ask them to get it from their family, whatever needs to be done, we get that information, and we fax it to the doctors, doctor or doctors, from the facility.

So I know that's how, either it would have been done on the day that he was examined or maybe the day after . . . .

Dr. Reddy's deposition testimony supports Marchesani's contention that the doctor used Patterson as a conduit for information. As defendants concede in their brief, Dr. Reddy "asked for the name of the doctor who prescribed the Dilaudid; for clearance that the Lyrica was being taken for diabetic neuropathy and not seizures; and for clearance from his doctor that he could drive, load and unload despite his cervical radiculopathy." Dr. Reddy admitted she asked Patterson for information about Dilaudid and other drugs taken by Marchesani. Dr. Reddy testified that she attached a post-it note to an October 30, 2013 letter directed to Hunt personnel and requested the name of the doctor who prescribed Dilaudid; Patterson was the person with whom the doctor was corresponding at the time. She believed she told Patterson about the medical clearance needed from his doctors.

13

This evidence is sufficient to permit a factfinder reasonably to infer that Dr. Reddy did not directly tell Marchesani all of the information that was needed for the certification, and that Patterson was the means by which the doctor sought to communicate with him.

There is evidence that Patterson told Marchesani about some items needed for medical clearance. By letter dated October 21, 2013, Patterson advised him to send a picture of the bottle in which his Dilaudid prescription was packaged.[7] Marchesani testified at his deposition that among the items Patterson asked him to provide were "five years of the prescription[s]" he took and pictures of the prescription containers.

The motion judge dismissed Marchesani's assertion that he did not know what information he needed to provide, finding he "testified to being informed about needing all the medications he listed and specifically about the Dilaudid. This testimony reveals that [he] was told about the information needed on the Dilaudid, and that the Defendants did not withhold that information from him."

The portions of the deposition transcript cited by the judge do not address the information the doctor required regarding

---

[7] Marchesani testified he believed he was advised of the need for the picture by phone.

Marchesani's medical conditions, particularly his cervical radiculopathy, information Marchesani says he was never asked to provide.

Further, the timing of the events following the October 15, 2013 exam establishes a disputed fact whether defendants used the lack of certification as a pretext to discriminate against Marchesani.

Patterson requested a picture of the Dilaudid bottle from Marchesani, whether by letter or telephone call, on October 21. Marchesani signed a statement dated October 23 on Hunt letterhead that he was "no longer taking or being prescribed" Dilaudid or Percocet. Dr. Reddy testified about the October 30 letter to which she attached a post-it note requesting the name of the doctor who prescribed Dilaudid, Percocet, and Oxycontin to Marchesani; she said she was corresponding with Patterson at the time she wrote the note. Dr. Reddy did not remember if Patterson responded to the post-it note, but did remember that Patterson provided "medication forms" after that time which contained information about Percocet and Oxycontin, but not Dilaudid. Marchesani had provided a printout from Shop Rite of his prescriptions. Dr. Reddy said she would have asked Patterson "to specifically get the information for the Dilaudid, and . . . would hold off until the Dilaudid information is back to us." As the motion judge noted,

15                                                    A-4751-15T2

"Dr. Reddy did not recall . . . Patterson ever providing the information afterwards."

Dr. Reddy testified she had several conversations with Patterson. When asked to tell what she recalled about them, she said:

> Mainly it was because she would tell me that [Marchesani is] getting frustrated that he is not being cleared, and I would tell her . . . I need the information as to who the M.D. is, who is prescribing it, and if he has the Dilaudid on him and just sends us a picture of the Dilaudid. Just because he sent those pictures of these, I would have asked her to get a picture of Dilaudid as well, the medication bottle.

The record is unclear when, between October 15 and November 11, those conversations took place. But, the evidence does establish Dr. Reddy needed information in order to clear Marchesani and told Patterson about that information; Marchesani provided a list of medications pursuant to Patterson's request; and Dr. Reddy did not receive the necessary information about the Dilaudid and the medical clearance from a doctor.

The activities on October 21 and 23; the exchanges between Dr. Reddy and Patterson; and Marchesani's provision of the list of medications, the pictures of the Percocet and Oxycontin bottles, and the October 23 letter about his discontinuance of Dilaudid and Percocet, point to ongoing efforts to supply Dr. Reddy with the

information she required. The delay, the frustrated inquiries by Marchesani, and the abrupt rescission of the conditional offer on November 11 is evidence from which a reasonable factfinder could infer that, despite Marchesani's ongoing efforts to supply Dr. Reddy with the required information, Patterson did not convey to Marchesani the need for, at least, the medical clearance from his doctors in an effort to delay the issuance of the certification, giving Hunt time to consider his medical condition as initially conveyed by Marchesani to the doctor, and rescind the conditional offer. It is evidence from which a factfinder could both disbelieve defendants' stated reasons, and believe Marchesani's medical issues were the reason he was not hired. If defendants did not convey the need for that information to Marchesani so that Dr. Reddy could not issue the DOT certification, the inference that defendants used the lack of certification as a pretext to deny him employment because of his disability is reasonable, considering the record established.

We note Marchesani contends he delivered what Patterson requested. It is obvious Marchesani did not show the doctor — or anyone else — the Dilaudid bottle, or a picture of same; he never took the drug. He realized that at his deposition. Since, however, he mistakenly thought he complied with defendants' prior requests regarding that drug, it can be inferred the alleged

17

intentional failure by defendants to communicate with Marchesani kept him from clarifying the discrepancy, and that his application was rejected before he had the opportunity to clear that issue.

The evidence in the record also belies defendants' second proffered non-discriminatory reason, that statements Marchesani allegedly made in connection with his social security application showed he was not qualified for the job. The application was submitted in 2011. It is not indicative of Marchesani's physical condition when he applied to Hunt, or his fitness to perform necessary duties for that job. Dr. Reddy admitted that she did not determine Marchesani was unfit and that she would have "absolutely" cleared him if she received the medical clearance and Dilaudid information, notwithstanding his past use of Dilaudid and Percocet, or his cervical radiculopathy, or his diabetes. A reasonable finder of fact could determine Marchesani's statements to social security were not the reason for the decision to deny him employment.

The evidence that could reasonably be inferred by a factfinder should have been credited by the motion judge as disputed facts which precluded the entry of summary judgment. We are compelled to reverse, reinstate Marchesani's complaint, and remand this case to the trial court for further proceedings. We do not retain jurisdiction.

A-4751-15T2

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION